We'll call the case of the United States of America v. Babaria. Mr. Mancano, am I pronouncing your name correctly? Mancano, Your Honor. Again, please. Mancano. Mancano. Thank you, Mr. Mancano. May it please the Court. My name is Joseph Mancano. I represent the appellant in this matter, Dr. Ashok Amar of Babaria. I'd like to reserve three minutes for rebuttal. Our brief contains three major arguments. I'd like to address my remarks this morning to the first of those arguments, the argument dealing with the abuse of a position of trust. We would rely on our brief for the hearing of the witness. This appeal presents a novel question of whether a Medicare-funded provider who pays kickbacks for referrals has abused a position of trust. And as the Court knows, in making that determination, a court must first decide whether or not a defendant occupied a position of trust. And secondly, did the defendant abuse that position of trust in a way that significantly facilitated either the carrying out of the crime or the cover-up? This is a case where the defendant's conviction was for violation of the anti-kickback statute. And you make much in your brief of the fact that, as in some of the other cases, including False Claims Act cases, which have some similarity to this, that there was no falsification of documents, there was no non-treatment or billing for a test that was never in fact conducted. That really has no impact, however, to the question, which is really just an interpretive question of 3B1.3, does it? You seem to be arguing equities more than anything. Well, the cases where the, except for two decisions, where the issue was taken on the square, the Adam case in the Fourth Circuit and the Liz case in the Eleventh Circuit, the 3B1.3 enhancement has been applied in situations where there has been fraudulent billing, specifically where the defendant abused either a fiduciary position that he or she occupied with respect to the victim or substantial discretionary judgment. All right. Well, that just tells us that that's the more common fact pattern. Why shouldn't we follow Adam and Liz? What's wrong with those decisions? Your Honor, I submit that those decisions were wrongly decided. The better reason the authorities hold that the fact that an individual or a provider is a Medicare-funded provider does not, as a matter of law, create a position of trust with respect to the program. I assume that you would agree with me that we have seen since the adoption of the sentencing guidelines and the inclusion of this abusive position of trust provision a substantial departure, if you will, from historical equity notions of positions of trust, that, in fact, the case law has embraced positions for the enhancement that would not have fallen into historical notions of positions of trust. Fiduciary-type positions, counsel, are what I'm referring to. Well, with respect to... That was a softball. I must not have asked it. Perhaps I don't understand your question, Your Honor. I think that's probably true. The enhancement, in order for the enhancement to apply, there has to be more than simply an arm's-length relationship between the government program or entity and the defendant. All right. Well, wouldn't the government here say that that has been supplied because Dr. Barberia had the authority to control OCN's activities? And he did. And he did. Absolutely. And his finance. He did. He did. There's no question about that. He controlled... He was the medical director. He controlled the finances. He controlled the payments to the doctors. He controlled corrupt referrals. He was in charge. He was the go-to guy here. He was the managing director, the medical director and the manager of this facility. There's no question about that. And without his certifications, they would not... I'm not sure here who was the provider, the Medicare, Medicaid provider. Was it the facility or was it him? Whatever. It was the facility. They would not have been payments by Medicare and Medicaid to him, which came in for $2 million-some-odd. How can you say? It's simply a certification. If you're talking about a certification, that's not determinative. Virtually every transaction, financial transaction with the government, requires the promise of veracity. This type of paper requires a professional license, doesn't it? Didn't Dr. Barberi, as a professional license, enable the company to get the right to submit the charges? The company had to be certified. How does it get certified? Some doctor, right? There had to be a physician. He was that physician. I agree with that. But narrowly, the position of trust reposed in a professional is between the professional and the person for whom the professional services are rendered, a lawyer and client, a doctor and patient. A doctor and patient, right. Here, it is between Dr. Barberi and the humongous government of the United States. I will submit that it is not between Dr. Barberi and the humongous United States. Oh, well, that was intended as a softball, too. I'll forget that. I'll forget that. In the context of this case, is it more than marginally relevant that he was a physician? It is not relevant. It is not relevant that he was a physician because his position as a physician did not enable him to commit a difficult-to-detect wrong or conceal the offense. If the offense had been committed by someone else within large degree MRI or someone outside of it, it would have been no more or less difficult to detect. So, it is not relevant. The relationship, how can that be in light of what we said in Sherman? I'm going to read to you what we said in 1998 in Sherman. Where the defendant obtains his minimally supervised position by virtue of his professional training and license and then takes advantage of the discretion granted to him in a way that significantly facilitates fraud, we can rightly say he abused a position of trust. Why is not your client's case on all fours with that? Well, because in Sherman, it was a very different case than ours. In Sherman, the doctor used his discretion in diagnosing illnesses and treating patients to commit his fraud. And that was important to the court. In addition, as the Nathan court read Sherman, it was important to the Sherman finding that the insurer used another system in monitoring compliance by the doctor and that it was financially prohibitive for the insurance company to double check the accuracy of what the doctor was doing. He was the medical director. He managed this place. You can see that he was the guy in charge. He didn't have to be a doctor to be in charge. He did not. No. He did not. He could have been a non-physician medical director. That's right. Now, you mentioned Nathan. You brought it up and you did try to distinguish that in your case. Tell us why Nathan. Granted, it was a different fact pattern, but every case is distinguishable. Why Nathan doesn't really help here. Because Nathan was very important to the court's decision in Nathan in that the government program involved there ceded its authority for compliance to the defendant. So it vested special discretionary authority in the defendant in Nathan. And that was important to the court specifically. But that's not what we have in this case. This is the typical doctor-Medicare-Medicaid relationship, which is arm's length. Medicare-Medicaid had the ability to audit everything doing what? What do you do about those certifications at 3031, the appendix, supplemental appendix? Where he essentially, to the extent I can even read them, he essentially certifies, represents compliance with all sorts of federal regulations and laws. Isn't that the deal here? Without those representations, without having made those representations and submitted those bills presumably under oath of some sort, he would not have received any money from Medicare-Medicaid, correct? Correct. So there was a position of trust which enabled him, which annihilated him, because he was doing the corrupt referrals from 2008 to the end of 2007. I would submit the answer to your question, Your Honor, would be no. To hold that there would be a position of trust under those circumstances would be to suggest that anyone who applies for, engages in a financial transaction with the federal government, someone who applies for a federal grant, a business owner who applies for a loan from a federally insured bank, by virtue of doing that occupies a position of trust. Oh, it's not enough. It's not enough in and of itself. Under the Sherman case, we have to show there are various things that have to be shown. But isn't that a very important fact here? The fact that he made the certifications, I would submit it's not determinative. And it's no different from the way the procedures were necessary. You say these procedures were fine, right? Correct, Your Honor. And you say that they get audited by the government. So how did he get caught? How did he get caught? The procedures were fine. The government audited a bunch of proper procedures. How did he get caught? Because there were various informants who staged it. Yes, Your Honor. So it would seem that by definition we have a very hard-to-detect crime. And if those snitches hadn't come to the attention of the government, perhaps the number would not have been 2 million. It may have been 10 million. Your Honor, I agree. It's inherently difficult to detect. That's exactly what the district court said in the Anderson case. In Crabb, we held a bank teller, a lonely bank teller, liable for abuse of position of trust, not because the teller was some sort of executive, but because of the difficulty of detecting the crime. Well, Your Honor, I would submit that it would be an unusual factual case where an ordinary bank teller would be subject to an enhancement for abuse of position of trust. Well, I think the application makes it quite clear. 3.1.3, the application, you know, excluded, specifically excluded the bank teller, but bank executives involved in the scheme did not. ...who engage in a horrible and low-transparency procedure, Your Honor, or an intern who is a guardian who fleeces a client, or a doctor who abuses a patient. Don't you have that here? Don't you have that kind of, I mean, this guy, this guy is in charge and he's doing corrupt referrals. And, you know, he's only has the ability to do it because he has represented to the government that it's going to be above board, essentially. There's no question that the practice represented to the judge, certified to the government that the law is abiding. So can't the government rely on his representations? Yes, but that's not enough. That's what I said before, but you keep going back to that. That's not enough. What is enough? What is enough? It's got to be more than the normal reliance that the government has in every financial transaction that it engages in with someone else. Should we establish a rule of law that says when a Medicare provider physician takes kickbacks,  but one who facilitates a scheme and conjures a scheme to give kickbacks doesn't? Well, there is a difference, and we actually made this point in our sentencing memorandum, between the doctors who received the kickbacks and Dr. Valerie who paid the kickbacks. It can be argued that the doctors who received the kickbacks actually did exercise some discretion in terms of where to send the patients that they were referring. But having said that, Your Honor, under the rationale that the court used in the Anderson case, which is the district court case from the District of Kansas, which I will submit, has the most thorough analysis of any of the cases that I've seen involving this issue. It can be argued that the doctors who actually received the kickbacks aren't subject to the enhancement. Well, the 15 of the 17 who then fled guilty and got, I believe, got the B1.3 enhancement, didn't they? As we pointed out in our sentencing memorandum, it isn't yes, but I'd like to add something to that, Your Honor. And the vast majority of those doctors agreed to that in plea agreements with the government. So it was a matter of contract between the doctors and the government. Every doctor that fled guilty agreed that he abused he or she. Your point is that it simply wasn't proven. Is that what you're saying? It was agreed to, it wasn't proven. Is that the point you're making? That's correct, Your Honor. All right, we will have you back on rebuttal. Thank you, Your Honor. Just a moment, Your Honor. Mr. Moore-Marco. Good morning, Your Honor. I'm Moore-Marco. I'm from the United States. I'm a surveyor for you in Philadelphia, but happy to be out here in New Jersey. Mr. Moore-Marco, what is the position of trust here? Let's start with the first thing. What is the position of trust that is implicated in the application of this enhancement? In this case, Your Honors, either a physician or a Medicare provider here in my diagnostic testing facility has a position of trust with Medicare and Medicaid. They're entrusted by the government to not give kickbacks. The position of trust is the entity? The position of trust, Mr. Marion has a supervisor or managerial position of trust within OCM. And the government relied on that position that he had of trust within Medicare. The position of trust, and especially the word trust, has deep historical roots in the law and in equity. Does this relationship find definition or reference anywhere in any of the documents entered into between the entity and Medicare or Medicaid? I think what I'm trying to say is getting at it. No, I'm not getting at anything. I just want to know if the language appears anywhere in writing. Well, there's nothing about you sharing a relationship with that social media. Okay, that's a start. Yeah, all right. So, what defines and where would be defined, if at all, this relationship of trust? Well, you would agree that there has to be a relationship for there to be a position of trust, right? Yes. All right. But I'm looking back at that, and I do like primarily the certification that we're talking about. It represents that the forms that he's submitting to reimbursement for Medicare and Medicaid will not be tainted by, for example, the improper kickbacks. So a clerk in his office who conjures the kickback scheme, and she gets an annual handsome bonus because of all the referrals, she would not be subject to the position of trust at all. Absolutely, Your Honor. And I think that's why I wanted to make the case, and I was trying to. The point I made is you need to have a managerial or supervisory role in the organization. Dr. Bavaria's employee did not receive the abuse of trust here. His name escapes me, correct? Mr. Patel did not agree, and also there was an individual, a male banker, who I also believe was a marketer who also presumably did not receive it. So if Patel organized the whole scheme and Bavaria was innocent and just duped by his employee, he could still get hit with the two-point enhancement? Simply by virtue of the fact that he's the one that certified in the government that the claims are valid? Your Honor, he was duped. He's not guilty of a crime. So he would have to appear before me. So I would have to audition. But one of the things I want to point out, I mean, it's interesting. When I was looking at the guidelines again this morning, the use of the position of trust is in the title, and I was just sort of wondering if they did it entirely differently, if you would not be sort of hung up so much on those words, because the claim defines a position of public or private trust. If in some way it stands, it refers to a position of public or private trust characterized by professional or managerial discretion. So if instead it had been for a use of professional or managerial discretion, then I think it would become an obvious case. I mean, some of the circuits have it in a much more narrow way than the Third Circuit has on this. But I'm not sure what you just said, because once we get beyond the heading, the very first clause, conditional clause, is if the defendant abused a position of public or private trust or used a special skill, we're still left as a predicate here with the question, what is a position of public or private trust? Is this a public trust or is it private trust in this case? This is a public trust with Medicare. He's also in a position of private trust. He holds that public trust. Or does Medicare hold that public trust? It's a position of trust between OCM and Medicare. What is a position of trust? Medicare. No, no, no, no. Who holds the position? I mean, I have this silly traditional notion that words mean something, and that has been my biggest problem with a long line of cases since the adoption of this provision. And, in fact, our dear departed colleague, Judge Becker, expressed some difficulty in that as well in a concurrence, which I never saw, frankly, until I began to prepare for this case. They're a muddle. We have to start with what the relationship is, and I'm still grappling with what the relationship is and what the position is that is somehow infused with incidents of trust. That's why my first question was, who is the provider here? The provider is the Diagnostic Testing Center. The center, and on those certifications, he was, Dr. Barbaro, was just the authorized signatory. Right. He was acting as the agent of OCM. Yes. But the provider itself was a facility. The provider is a facility, yes. And let me try to break this down. It seems to me that it started with a simpler question of whether or not physicians have a position of trust with Medicare. And I think that's the obvious answer. I think the insurer in Thai, even though they didn't deal with Medicare and Medicaid, because they felt there was a position of trust for physicians with private insurers, and there's certainly no reason why, I mean, in Thai it was a trust fund set up for victims, that there's a position of trust for physicians towards those private companies. There's no reason why Medicare and Medicaid wouldn't be in the same position. Now, OCM is just another provider to Medicare. So if physicians have a position of trust relationship with Medicare, then OCM has a position of trust. I understand, Judge Smith, that in some ways I'm melding, because I think— You're not alone. Right. I'm not alone here. And I think Dr. Bavaria's position of trust is really with his organization in the first instance. And then he's acting as an agent of OCM in the trust relationship between OCM and the government. Of course, you've also got the relationship between the referring doctor and Dr. Bavaria. Yes. And the referring doctor's relationship with their patients, which I don't know, vicariously— Let me ask this question. He pled guilty to a violation of the anti-kickback statute. Why doesn't the crime itself inherently involve an abuse of trust vis-à-vis Medicare and Medicaid? I mean, that—it says right in 3B1.3, this adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristics. Why wouldn't the crime itself inherently involve— Because the low-level people in the organization do not qualify for that enhancement. The bookkeeper who knows what's going on, the office manager who knows what's going on— I'm talking about—no, no, I'm talking about Dr. Bavaria, who pled guilty here to violation of the anti-kickback statute. It's not inherently going to define him, because people can do this crime without having the managerial or supervisory role that gets this enhancement. He is more guilty and is entitled to two more points and more punishment because of his high-level managerial relationship with an OCM. That's our position as to why he got those two extra points. And it's not part of the crime, because people who weren't in his position were also found guilty and didn't get the enhancement. But how do we define that high level? It's a little indefinite. Do you want us to just follow Adam or what? Well, I don't know— It's a really definitional challenge we have here. Well, I don't think about it in this case. This is the part where the court has to make a factual finding. And so we're going from the, you know, is there a position of trust in this type of relationship? Did he, in fact, abuse it? And that's where you get into the facts of the case, where you talk about how he's the one who's letting this show. He's the one who agreed. You know, he provided the cash to the people who were making the bribes. He agreed to the terms. He did not, in this case, sell a loan. And that's the thrust you get at Nathan. That's the thrust you get at Sotomayor. Let me start with a very basic question and one with the answer, which may be obvious, but I probably should have asked it earlier. What separates the relationship and, therefore, the position here of this case and any garden-variety government contract with a vendor? I mean, two things. If I could, just to expand on that. So what incidence of trust is the government imparting in this relationship, and the doctor assuming, that do not occur in that garden-variety government contract with a vendor? I don't know how to say it. I mean, I'm not an inspector here. And his comparison would be one of the greatest compliments ever made to me, let me assure you. But, again, I only saw the concurrence recently in preparing for this. Yes, sir. I think one of the things we learned in Igonomi is that, in fact, this abuse of trust enhancement is very broad and is applied very broadly beyond traditional notions. And I think what Judge Becker was complaining about in that concurring opinion, he was urging the sentencing commission to narrow the thing. And he was urging this Court to sit on bond and adopt a narrower relationship. But the sentencing commission never did anything with this. And this Court never sat on bond and limited it to the new shared relationships and employee relationships. So she wanted us to sit on bond in every case. That's true. And Judge Berry and I didn't, believe me. So my answer to your question is not very satisfying in the sense that… I think your answer to the question is a good one, in fact, because I'm not trying to swim upstream here. But it occurred to me that maybe the answer here is to carve out some, by way of the sentencing commission and a different enhancement, to carve out some special enhancement where you're dealing with fraud or kickbacks in the Medicare and Medicaid area, which would make it clear and we wouldn't have to go through the kind of training… I think the best limiting principle is to make sure that this is not applied to low-level employees and organizations that are engaged in this kind of fraud. I think that at least ensures that it is not just sort of, okay, you've made this kind of crime, you get this enhancement. That at least is some limiting principle. But why isn't everyone who's involved with a government contract or in a position of public trust? Well, that's why it's so hard to… That was the question I asked, in fact, and it just occurred to me you didn't answer that. Because I do think that there are several things that go into… I mean, none of us enter into a contract if we figure somebody's going to cheat us, do we? So, I mean, you've got to be… Yeah, you're not all absorbed in this Medicare and Medicaid fraud. Well, is that because the government's so huge and they just can't be in every place? That was the softball I was serving up to your adversary, but he didn't recognize it. Well, the argument in this court, except in Sherman, was that the government can't be following around these medical providers and making sure that everything they say they did, they in fact did. Sometimes they're using their discretion, sometimes they're billing for services they haven't even provided. It is a huge national problem, and I think, you know, appropriately, the guidelines can be tried to get at, giving two additional levels to people who contribute to this very difficult to get to the bottom of a provider. It would have been a lot easier for all of us if the sentencing commission and our dear friend Judge Saros decided to take up a special exception for this kind of a situation and we didn't have to try to squeeze it into something called an abuse of a position of trust. Yeah, and I think in fairness to Judge Cheney, she was following the three-part test that's provided. She had to choose between a line of cases where this court, in both Sherman and Tye, endorsed Liss and Adam, and those are the cases that suggest that the enhancement is appropriate. It's a challenging and interesting question, but I was surprised you didn't rely on Sebelski as a fallback, because is this an academic matter? I mean, the gentleman was obviously well-liked. There were, I think, seven letters. He was repentant, cooperative, and he earned himself a pretty healthy downward variance. Why does this matter? Well, let me just say, Your Honor, I apologize. Sebelski is a great case. I took a lot of grief from my companion, from my compatriot. We're not trying to give you any trouble. I'm just having a peculiar relationship with him. I don't have any example that we're not citing Sebelski. This really falls within that reason. In that case, there was a downward variance here. There's a good substantial downward, maybe partly. This is a little tongue-in-cheek, because as your friend across the aisle describes his client as elderly. He was 64 years old. We're not holding that against you, counsel, but it was really caught. But I'm losing the plot now. I'm losing the plot. Well, how do we know? Sebelski, I think, says we need to be supremely confident in reviewing the record that the district court rule cannot the same way even have the enhancement not be a plot. How do we know that on this record? On this record, your Honor, what you have is a downward variance that goes significantly below the guideline range, even if the two points had been reduced. And that guideline would have been? The guideline range. Without the two points. Let's see. Receive the 46. 58 to 60. It was a 60. 58 to 60. It was just 60 plus. Yeah, it was about a 60 minimum at 27. The only other factor in Sebelski was, and I think this was important, the judge clearly understood these facts. Whether or not it was the enhancement, she knew what was going on. The thought I lost before and I had meant to say, she not only knew what was going on, I thought that this was an extremely thorough, very, very, very thorough opinion and consideration by Judge Checki of the sentence. I mean, the transcript was 128 pages. She considered every argument and I thought she did a very good job. Second of all, where would we go on this issue? I thought she did an extraordinarily good job. Thank you, Your Honor. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you very much. We'll have a rebuttal from Mr. Marcano. May I rephrase what Mr. Marcano described as Sebelski? Yes, absolutely, Your Honor. I think Sebelski makes clear that it is a rare case where the record reveals that there would have been no difference in the sentence had the correct guideline been used. Here, the correct guideline would have been? In fact, was it 58 to 60? Putting aside the other arguments that we made in our brief, as you know, we challenged the manager-supervisor enhancement, but it would be, if we were to prevail on this, 57 to 60. He ends up with 46. He ends up with 46, but it's important that the court calculates the variance. So if you hadn't gotten the two points, your top would have been 46. No, the top would have been 60. No, if she, yeah, okay. That's right. Even if you win on the basic position of trust, you still have a downward variance from the bottom of the guidelines of 57 down to 46. But it would still have been a variance. That's right. I'm sorry, I didn't hear you. There still would have been a variance. Yeah. There still would have been a variance if the court were to apply the same degree of variance. But is there anything to that effect? Did she, for example, did Judge Checky say something like the guideline range is 60, which is the statutory maximum, and I think 13 months below the guidelines is appropriate? Did she say anything like that? Well, the government conceded to a variance of approximately 20%. Okay. And, Mark, that's all I need to hear. Go ahead and make your rebuttal. I didn't mean to start you off. There's quite a way to go. But we don't have a record here that approaches the record that we had in Zabelski where the court very assiduously went through the 3553A factors, made detailed factual findings, and the court said in Zabelski that it's a rare case. And this is not that rare a case. And even if the court were to apply the same degree of variance, from the level of the fact... You persuaded me of Zabelski. Go ahead and make your rebuttal. If there's anything else. Unless the Court has further questions, I have nothing else to add. Thank you very much. Thank you. I'd like to thank counsel for your very helpful arguments. We'll take the case under advisement.